**COURT OF APPEALS
DECISION
DATED AND FILED**

**March 25, 2026**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

| | |
|---|---|
| **Appeal No. 2024AP4** | **Cir. Ct. No. 2020CV654** |
| **STATE OF WISCONSIN** | **IN COURT OF APPEALS DISTRICT II** |

LOWELL MANAGEMENT SERVICES, INC.,

    PLAINTIFF-APPELLANT,

  V.

MATTHEW D. RUECKER AND DAWN M. RUECKER REVOCABLE TRUST,

    DEFENDANT-RESPONDENT,

SCOTT LOWELL,

    THIRD-PARTY DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Walworth County: DAVID M. REDDY, Judge. *Reversed and cause remanded with instructions.*[1]

---

[1] In addition to the damages at issue in this appeal, the judgment includes damages for breach of contract. Because no parties have challenged those damages in their appellate briefs or arguments, that part of the judgment remains in place.

Before Gundrum, Grogan, and Lazar, JJ.

¶1 LAZAR, J. Lowell Management Services, Inc., and its president, Scott Lowell,[2] appeal from a judgment entered after the circuit court ruled in favor of the Matthew D. Ruecker and Dawn M. Ruecker Revocable Trust[3] following a bench trial in a construction contract case. Lowell challenges the trial court's orders finding personal jurisdiction over Lowell; allowing amendment of pleadings mid-trial; applying an administrative code provision; and awarding damages for breach of contract, slander of title, and double damages against both LMS and Lowell. We conclude there was no personal jurisdiction over Lowell, and therefore, only the breach of construction contract damages against LMS are appropriate. Moreover, because the trial court erred in amending the counterclaims mid-trial, it could not award damages for slander of title under the administrative code, which eliminates an entitlement to double damages.

¶2 The application and interpretation of the major renovation exception to the Home Improvement Practices Act (HIPA), under the administrative code, is a cornerstone issue on appeal. *See* WIS. ADMIN. CODE § ATCP 110.01(2) and (2m) ("'Major renovation of an existing structure' means a renovation or reconstruction contract where the total price of the contract is more than the assessed value of the existing structure at the time the contract is initiated."). To resolve this question of first impression we must decide what constitutes a "total price," for the purposes of HIPA. Here, the construction contract between LMS

_____

[2] For ease of reference, Lowell Management Services, Inc. and Scott Lowell will be, respectively, referred to as LMS and Lowell.

[3] The Trust is the named party, but the Rueckers are the homeowners involved. We will refer to the Trust as the Rueckers, and, when necessary, identify them individually.

and the Rueckers was labelled a "NOT TO EXCEED CONTRACT[,]" not what is known in the industry as a fixed price contract. The contract identified a sufficiently exact and discrete price that exceeded the then-existing value of the residence. Thus, the contract price triggered the HIPA major renovation exception. As a result, a claim may not be made under the administrative code regardless of whether it was timely made against LMS or Lowell.

¶3   Accordingly, we reverse and remand with instructions.

**BACKGROUND**

¶4   In June 2019, the Rueckers entered into a construction contract with LMS which was to act as their general contractor to completely renovate their house. The Rueckers contend they did not necessarily voluntarily agree to enter into the contract, but that after LMS emailed a revised version it had signed (that indicated the "New overall Contract Price is $511,331.15"), LMS actually began demolition of the residence before the Rueckers counter-signed the document.[4]

¶5   Despite being labeled a "NOT TO EXCEED CONTRACT[,]" the document incorporated a two-page "Construction Proposal" with a precise itemization of costs for 59 items ranging from permits, excavation, electrical, plumbing, and masonry to windows, doors, cabinets, tile, carpet and appliances, for a total price of $511,331.15. That price was also stated under "Article 4. THE CONTRACT PRICE" as:

---

[4] The Rueckers assert they had no option but to enter into the contract because work began before they counter-signed the contract. That allegation does not alter our opinion nor are there any assertions that the parties had not both eventually entered into a written contract.

4.2 "Not To Exceed" Construction costs and coordination are Five Hundred Eleven Thousand Three Hundred Thirty One Dollars and 15/100 ($511,331.15).

4.3 The Owner and the Contractor acknowledge that the Owner will pay a sum of Seventy Six Thousand Seven Hundred Dollars and 00/100, ($76,700.00), upon signing of this contract and before construction begins as a deposit and part of the purchase price of the project. The deposit will be credited to the billing on a percentage of completion basis.

¶6 LMS sent five progress payment billing statements to the Rueckers between July 2019 through August 2020; four of them began with a line item that the "Original Contract" amount was "$511,331.15[.]" The Rueckers paid the first four billing statements. The final statement was not paid.

¶7 Almost from the start, the renovation project was beset by concerns and complaints of delay and poor workmanship including defective or incomplete work. LMS conceded that there were defects but assured the Rueckers that appropriate repairs or corrections would be made promptly. Those repairs were allegedly not satisfactorily made and the Rueckers refused to pay the last billing statement. LMS filed suit to enforce its claim for lien, seeking payment of an alleged outstanding balance of $60,234.52. The Rueckers filed an Answer admitting that LMS "performed labor and services and provided materials to remodel" their house, but counterclaimed for breach of contract seeking damages for the faulty workmanship. The counterclaim did *not* mention HIPA, slander of title, double damages, or Lowell personally.

¶8     In May 2021, the trial court entered its first scheduling order listing the deadline for amendments to pleadings as "n/a"—meaning "not applicable."[5] The order indicated a summary judgment hearing would be in October. Both LMS and the Rueckers filed for summary or partial summary judgment.[6]

¶9     Leading up to the summary judgment motion hearing, both LMS and the Rueckers filed pleadings in which they agreed that this was not a minor project, but rather encompassed a full renovation of the house.[7] One of the Rueckers's briefs explained that they had "hired [LMS] to perform extensive remodeling work at the Rueckers'[s] future home."

¶10     At the same time, the Rueckers advised the trial court that "[t]his is a simple breach of contract case that the [c]ourt can decide based on irrefutable facts." Throughout their pleadings, the Rueckers repeatedly stated that there is a set contract price. In Matthew Ruecker's supporting affidavit, he explained how the negotiations began with "a firm estimate of the Project cost of $492,000" but then "[a]fter multiple lengthy discussions with Scott Lowell in April and May of 2019, he provided [the Rueckers with] a signed contract for us to review on May 30, 2019, with a *total cost of $511,331*" (emphasis added). In two of the

---

[5] The parties stipulated to amending the Scheduling Order three times over the next year, but at no time did they seek to extend the time to add new parties or to amend pleadings.

[6] LMS's motion for partial summary judgment only involved whether it had complied with the statutory requirements and procedures for its claim for lien.

[7] In his expert report, Lowell explained that the "key components" of the renovation included reworking the garage, mud room, rear stairway, kitchen cabinets, lighting, and master bath, as well as building a new deck, powder room, first floor wooden floors, part of the roof, interior trim, and front columns. LMS was also to lay a new garage slab and move a fireplace. The Rueckers's architectural expert report confirmed this was a major project that consisted of the "construction of the addition" and whose scope "involved primarily remodeling of the existing residence[.]"

Rueckers's trial court briefs, one in opposition to LMS's motion and one in support of their own motion, the Rueckers stated that "[o]n a $511,331.15 contract, only $60,234.52 remains unpaid" and qualified this amount as "less than 12% of the Contract price." There is no mention of HIPA, slander of title, double damages, or Lowell's personal liability. The Rueckers's attorney also argued to the trial court, during a discovery dispute, about the contract price and the extensive nature of the project.[8]

¶11 On September 30, 2022, the trial court granted LMS's motion for partial summary judgment with respect to lien procedure, but, noting that the case was "replete with genuine issues of material facts[,]" denied the Rueckers's motion for summary judgment on their counterclaim. The court set a trial date.[9]

¶12 About a week before the bench trial, LMS moved, pursuant to WIS. STAT. § 802.09(1),[10] to amend its pleadings to include claims of defamation and intentional interference with contractual relationships against the Rueckers, and sought to add Matthew Ruecker, individually, as well as one of the Rueckers's

---

[8] The Rueckers's attorney explained:

> There are a lot of components with this project, which by the way was over a half a million dollars in value when it started out.
>
> So it's not an insignificant remodel. It's a huge remodel and there are various components here ... .
>
> ….
>
> It was a $500,000-plus construction project to begin with.

[9] In their Trial Brief, the Rueckers repeated their statements that "[t]his is a fairly simple breach of contract case between the Rueckers and [LMS] for a large remodel of the Rueckers'[s] home ... ."

[10] All references to the Wisconsin Statutes are to the 2023-24 version.

counsel and his law firm as parties. At the pre-trial conference days later, the Rueckers's counsel opposed the motion because it was "filed a week before the start of the trial." The trial court agreed and, finding LMS's motion to amend was "not timely," denied the motion without prejudice.

¶13 The trial to the court spanned eight days. It was initially set to be a five-day trial in December 2022.[11] The trial started with a focus on the renovation work done, delays, the lien, and the repair work remaining. There were questions as to the contract and the final contract price: (1) Lowell testified that the contract price was $511,331.15; (2) Matthew Ruecker testified that figure was the final, not-to-exceed contract price and that the "remodel cost as much as the home"; and (3) Dawn Ruecker, when asked about the last price LMS provided, testified, "[t]hat price is now $511,331.15."

¶14 It was not until the *fifth* day of the five-day trial, after all of LMS's witnesses had testified (with the exception of cross-examination of Matthew Ruecker), and the Rueckers's witnesses had all testified, that the Rueckers, pursuant to WIS. STAT. § 802.09(2), orally moved the trial court to amend the pleadings to conform to the evidence. The Rueckers sought to add two claims: one "for violations of [WIS. ADMIN. CODE §] ATCP 110 and the [other for violations of the] slander of title statute[.]" The Rueckers did not state that they sought to add any additional parties.

¶15 LMS objected on several grounds, including that it would have presented its case differently. LMS's counsel stated that they "certainly would

---

[11] For reasons explained later, the trial extended to three more days in March 2023, and concluded in November 2023.

have called additional witnesses had [he] known that either of these issues were on the table." LMS further objected that "certainly without giving us an opportunity to present counterevidence, [counsel does not] think it would be appropriate [to allow the Rueckers to file amended pleadings.]"

¶16    Without more argument, the trial court immediately ruled and granted the motion:

> I think that's one of the things that at least the case law interpreting the statute says that if there does present any prejudice to the other party, that a continuance is an option. We're going to have to continue this anyway.
>
> As I said, I am all about notice and fairness. So what I'm going to do is have you file the amended complaint with your two new claims, give you, [LMS counsel], an opportunity to answer that complaint. Maybe we'll start the litigation all over again. I can see motions to dismiss. I can see summary judgment motions.

¶17    On December 21, 2022, the Rueckers filed a Third-Party Complaint and Amended Counterclaim. The amended counterclaim added not only the two counts against LMS that the Rueckers had orally sought leave to file, but it also added a count for breach of duty of good faith and fair dealing against LMS, and, via the third-party complaint, it added a completely new party, Lowell, personally, with respect to the HIPA violation claim. The new pleading still alleged that the "Construction Contract" had a "New overall Contract Price [of] $511,331.15." There is no mention of the value of the Rueckers's house, nor is there an allegation that the major renovation exception does not apply.

¶18    LMS, already a party in the action, filed a Reply to the Amended Counterclaim in January 2023 in which it raised the HIPA major renovation exception contained in WIS. ADMIN. CODE § ATCP 110.01(2m), and argued that "[i]t is undisputed that the assessed value of the Dwelling was four hundred fifteen

8

thousand six hundred dollars ($415,600.00) on May 30, 2019 and the Contract price was five hundred eleven thousand three hundred thirty-one dollars and fifteen cents ($511,331.15)." LMS also affirmatively defended by asserting that the HIPA claim was frivolous due to that exception. Lowell did not file a reply.

¶19     In February 2023, LMS filed a motion for partial summary judgment and for sanctions on the grounds that the HIPA claim against LMS was barred under the major renovation exception and was, therefore, frivolous. Lowell did not join in this motion.

¶20     The Rueckers did not personally serve Lowell with the Third-Party Complaint within 90 days from its filing (the 90 days expired on March 22, 2023). They had mailed a courtesy copy to LMS's counsel, who was also counsel for Lowell, on December 22, 2022, but appeared to take no further actions to personally serve Lowell until March 20, 2023 when a process server attempted to meet with Lowell. Instead of attempting to serve Lowell during the 90 days or of publishing and mailing against Lowell due to an inability to serve him, the Rueckers filed an Amended Third-Party Complaint on March 21, 2023. On that same date, LMS's counsel wrote to the trial court objecting that, among other grounds, the Rueckers's "illegal filing of their Amended Third-Party Complaint is an attempt to pursue their frivolous claims against Mr. Lowell personally. This refiling arises from the expiration and nullification of Defendants' Third-Party Complaint for lack of service upon Mr. Lowell." Counsel also noted that Lowell would not even have time to respond before the trial recommenced on March 24, 2023.

¶21     The Rueckers wrote to the trial court on March 22, 2023, asserting that their amendment was "within the timeframe to file an amended pleading as a

matter of course." The Rueckers also offered to try the HIPA claim against Lowell separately at a different time. That same date, LMS again filed another written objection explaining that Lowell had not been served within 90 days and the Rueckers had not even attempted to publish and mail to accomplish service. Thus, LMS objected to any further adjournments.

¶22 On March 24, 2023, prior to the continuation of the bench trial that same day, the Rueckers filed a brief on the applicability of HIPA and asserted that the major renovation exception did not apply because, while the house was valued at $415,000, the $511,331.15 contract had to be reduced by all of the change orders and other reductions; thus, it was really a contract for $335,775.16. The trial court started the bench trial by seeking time to read the Rueckers's brief and, after short argument by counsel, ruled that "this was not a major renovation of an existing structure and HIPA applies." When asked for clarification, the court stated that the HIPA claim survives summary judgment "[a]nd it would be … [the Rueckers's] burden to prove that the ultimate contract amount did not exceed the assessed value at the time the contract was initiated." Thus, the parties understood that they had to argue about what the contract's price was after change orders and other possible reductions, including for work not performed.

¶23 The trial court next addressed the lack of personal service on Lowell. First, the court took issue with the fact that Lowell (who had attended all of the other hearing and trial dates) was not present that morning. The Rueckers admitted that they had not been able to personally serve Lowell (whom they

claimed was now hiding) within 90 days, and their counsel admitted that he had hesitated to serve Lowell right away.[12]

¶24 The trial court noted that WIS. STAT. § 802.09(2) allows for the amendment of pleadings and that it "shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the Court that the admission of such evidence would prejudice such party in maintaining the action or defense upon the merits." Therefore, the court held:

> So I'm not going to allow procedure to overcome what would be an injustice I think in terms of allowing the defense to present evidence on a claim that on its face appears to be valid. I'm not just going to look the other way, [LMS counsel].

¶25 Following the trial court's ruling, LMS and Lowell's counsel refused to sign an admission of service form presented by the Rueckers's counsel. The court advised the parties that it was going to proceed anyway implying it had personal jurisdiction over Lowell due to the Amended Third-Party Complaint:

> Obviously we can proceed on the complaint -- the amended complaint until there's an answer, although again, [the Rueckers's] argument is substance over form, which is the evidence is going to be the same with respect to the HIPA violation for Mr. Lowell's personal liability.

---

[12] The Rueckers's counsel admitted that he was the cause of the delay:

> I definitely could have served earlier, but I was having a moral debate of what to do and finally got comfortable with my arguments and that I could present those in good faith and I had a reasoned explanation and I tried to serve it at the end. So I apologize for my part in creating the procedural path that we're on. But we did try and serve before the end.

11

¶26 The parties were then asked to complete their cases-in-chief. LMS indicated that it was not going to call any rebuttal witnesses and that it objected to the Rueckers's desire to recall their expert witness to testify with respect to HIPA. The court, over that objection, allowed the Rueckers to bring their expert back as a surrebuttal to a rebuttal that LMS did not present. When the Rueckers's expert retook the witness stand days later, he agreed that, in a "not to exceed contract[,]" "you don't determine the total price until the project is done[,]" and he testified that "[t]he total price would be determined upon the final billing."[13] LMS believed it had to put on a response after the court reopened rebuttal for the Rueckers over LMS's objection, and that Lowell was a necessary witness. Accordingly, to get that testimony before the court, Lowell's counsel signed an admission of service on his behalf with respect to the Amended Third-Party Complaint.[14]

¶27 Following the March 2023 hearing, in their post-trial brief, the Rueckers first asserted that the "'total price' of the Contract was no more than $294,900.15." In an affidavit submitted to the court by LMS's counsel, he referenced an email from the Director of the Bureau of Consumer Protection (BCP),[15] which stated:

---

[13] This position came after LMS's counsel argued, at the start of that day's trial, that the Rueckers were confusing the total "price" in the HIPA exception with the "value" of the contract (after all of the work was completed). The trial court took the matter under advisement and sought post-trial briefs.

[14] That admission of service did not reference the original Third-Party Complaint and was proffered by the Rueckers's counsel "in light of [the trial court's] ruling ... ."

[15] The Bureau of Consumer Protection is a division of the Wisconsin Department of Agriculture, Trade, and Consumer Protection.

> Total price of the contract is agreed upon amount listed on the contract <u>at the time it's initiated.</u> The total price does not include additions or subtractions because those happen after the contract is signed.
>
> I'd also clarify that "for a sum not to exceed $500,000.00" is not allowed under [WIS. ADM. CODE § ]ATCP 110.05(2)(c). That law requires a *specific price* to be stated on the contract. (Second emphasis added.)

¶28 The Rueckers objected to the use of the BCP email because it was not drafted by an "expert[,]" the drafter was not a witness in the bench trial, and it was allegedly inadmissible hearsay pursuant to WIS. STAT. § 908.01(3). LMS and Lowell asserted it was just "persuasive legal authority[.]" The Rueckers also objected to the BCP Director's testimony at a subsequent evidentiary hearing. The trial court agreed that the email was improperly admitted hearsay, but initially held that it was going to rely upon it anyway. At a later hearing, however, the court held that the email was only admissible if there was a proponent who testified as to its authenticity and content.

¶29 On July 15, 2023, the trial court issued an order denying LMS's claims, granting the Rueckers's counterclaims, and setting an evidentiary hearing on the issue of the HIPA major renovation exception. The court also granted the Rueckers's attorneys' fees in an amount to be determined later. In September 2023, the Rueckers filed a motion to amend their Amended Third-Party Complaint yet again, this time alleging the slander of title cause of action against Lowell

personally. LMS and Lowell objected. The court orally allowed this amendment and ruled that conditional privilege did not apply as to Lowell.[16]

¶30 After two-and-one-half years of litigation (and one-and-one-half years after first raising their new HIPA cause of action), and after realizing that the contract's total price, for HIPA purposes, cannot be reduced during the term of the contract, the Rueckers recharacterized their position as to why the major renovation exception did not apply: they asserted that "not to exceed" contracts simply do not fall within that exception because there is no total price listed on the date the contract is signed, due to later reductions in the price. At the evidentiary hearing in November 2023, LMS and Lowell argued this was the "ultimate legal bait and switch[.]" The trial court allowed the Rueckers to argue this position.

¶31 Two attorney expert witnesses testified at the November 2023 hearing regarding the HIPA major renovation exception. One, an attorney who was involved with the legislation that added the major renovation exception to HIPA, testified as to its purpose:

> the idea was that if the total cost of the renovation was as much or more than the value of the structure it wasn't what was intended to be covered by the home improvement act. It's really more -- it's akin to being a new construction, like a new residence.

---

[16] Upon a review of the Record, we note that—while the trial court ultimately granted judgment based upon the claims the Rueckers asserted would be filed in a second Amended Third-Party Complaint—that pleading was never filed nor served upon Lowell. A motion to amend was filed, in September 2023, with a proposed second Amended Third-Party Complaint attached as an exhibit, but that pleading was never filed, the court did not order that it was effective the date it was filed (or any other date) when it granted the motion 45 days later, and—if it was "effective" when filed as an exhibit—Lowell would have had no real time in which to answer before that time period expired. Instead, the Rueckers proceeded as if they had filed the last pleading, and the trial court accepted evidence on Lowell's conduct and possible privilege defenses.

He further testified that, in his opinion, "not to exceed" contracts were not barred under HIPA's exception:

> [a]nd I don't see anything in that language that would prohibit a not to exceed number as long as you include in the contract what's required such as the total costs -- ... finances charges and so forth.

¶32 The first attorney expert testified that the total price of the LMS contract with the Rueckers was $511,331.15. Based upon a review of the tax-assessed value of the residence at the time the contract was signed, this expert further opined that the "home improvement act ATCP 110 would not apply because this is [a] major renovation."

¶33 The second attorney expert (offered by the Rueckers), also with real estate and HIPA experience, testified about the BCP email over LMS and Lowell's objection to its introduction. Despite having informed the parties that the email could not be introduced unless its drafter was present to testify as to its authenticity, the trial court allowed its admission because "[e]xperts can rely on hearsay in making their decisions." Following that ruling, the second expert opined "[t]hat HIPA would apply because the builder or contractor in this particular case has not met its burden to prove that this was a major renovation."

¶34 On December 5, 2023, the trial court issued a Decision in which it held that HIPA's major renovation exception did not apply because "a specific price need[ed] to be stated in the contract[,]" and this "NOT TO EXCEED" contract contained uncertainty. In January 2024, the trial court entered judgment for breach of contract against LMS, and for slander of title and for violations of HIPA against both LMS and Lowell. It ordered damages against both parties, concluded the HIPA violation damages consisted of both breach of contract and

slander of title damages, and then doubled that amount under HIPA. It also awarded attorneys' fees and costs to the Rueckers.[17]

¶35 LMS and Lowell appeal.[18] The Rueckers cross-appeal from the judgment.[19]

---

[17] In sum, the judgment entered against LMS required it to pay the Rueckers the amount of $383,027.60 (breach of contract) and $41,832 (slander of title). It required LMS and Lowell to pay the Rueckers the amount of $894,033.82, and it required LMS and Lowell jointly to pay the Rueckers's law firms in the amounts of $559,852.23 and $113,643.56. It appears the trial court double-counted the cost of the transcripts.

[18] During oral argument to this court, Lowell withdrew the part of his appeal that challenged the Rueckers's failure to properly notice their request for, or even receive, leave to file a third-party complaint pursuant to WIS. STAT. § 803.05(1). In supplemental letter briefs submitted after the oral argument, the Rueckers assert that the withdrawal of the leave to file a third-party complaint constitutes an implicit withdrawal of LMS's argument that the leave to file amended counterclaims mid-trial was erroneous. LMS disputes that there was an implied withdrawal of the second issue and "conced[es] the [trial] court lawfully granted leave for an untimely third-party claim under § 803.05(1), but maintains that [the court] erroneously exercised or failed to exercise its discretion as to the untimely counterclaims under § 802.09(2)."

We agree with LMS and Lowell. The only issue we no longer need to address is whether the trial court properly granted leave to file a third-party complaint against Lowell.

In addition, on July 14, 2025, LMS and Lowell filed a motion to strike the Rueckers's Surreply Brief; the Rueckers filed a response to the motion that same date. By Order dated July 17, 2025, we held the motion in abeyance but granted LMS and Lowell an opportunity to file a short response to the Surreply. Based upon our opinion, and despite the fact that no surreply was requested nor permission to file the same granted, we now deny the motion as moot.

## STANDARD OF REVIEW

¶36    Several standards of review are implicated in this appeal. Interpretation of a statute or administrative code section presents a question of law reviewed de novo. ***DOR v. Menasha Corp.***, 2008 WI 88, ¶44, 311 Wis. 2d 579, 754 N.W.2d 95. Factual findings of the trial court are reviewed under a "clearly erroneous" standard, pursuant to WIS. STAT. § 805.17(2).

¶37    "Whether service of a summons is sufficient to obtain personal jurisdiction over a [third-party] defendant involves the interpretation and application of a statute to undisputed facts and is reviewed as a question of law." ***Useni v. Boudron***, 2003 WI App 98, ¶8, 264 Wis. 2d 783, 662 N.W.2d 672; *see* ***Dungan v. County of Pierce***, 170 Wis. 2d 89, 93, 486 N.W.2d 579 (Ct. App. 1992). "Issues of personal jurisdiction are questions of law which we review de novo." ***Kohler Co. v. Wixen***, 204 Wis. 2d 327, 334, 555 N.W.2d 640 (Ct. App. 1996).

---

[19] The Rueckers filed a cross-appeal. Pursuant to their docketing statement, the Rueckers intended to raise two multi-part issues on appeal identified, in part, as: "(1) Amount of slander of title damages/breach of contract damages -- specifically should the Court have awarded as damages the increased interest rate for the entirety of the 30-year mortgage rather than as awarded, awarding increased interest rate only during the period of the lien?"; and "(2) Amount of breach of contract damages and HIPA damages -- should the Court have awarded the entire contract price ($511,000 less $50,000) as breach of contract and HIPA damages rather than the cost to repair?" Although these issues were asserted in the statement and the Rueckers identify themselves as Respondents-Cross-Appellants in their response brief, they did not argue these—or any cross-appeal—issues in their brief or their oral argument, and they did not file a cross-appeal reply brief in this appeal. "On appeal, issues raised but not briefed or argued are deemed abandoned." ***State v. Ledger***, 175 Wis. 2d 116, 135, 499 N.W.2d 198 (Ct. App. 1993). We, thus, deem these cross-appeal issues to have been abandoned and we will not consider them. *See* ***State v. Ayala***, 2011 WI App 6, ¶22, 331 Wis. 2d 171, 793 N.W.2d 511 ("An issue raised in the trial court but not argued in a party's appellate brief is deemed abandoned and will not be considered.")

¶38 "'A trial court's decision to grant leave to amend a complaint is discretionary.'" ***Piakoski & Assocs. v. Ricciardi***, 2004 WI App 152, ¶30, 275 Wis. 2d 650, 686 N.W.2d 675 (quoting ***Finley v. Culligan***, 201 Wis. 2d 611, 626, 548 N.W.2d 854 (Ct. App. 1996)). We "will not reverse a trial court's discretionary decision unless the record discloses that the court failed to exercise its discretion, that the facts do not support the decision, or that the court applied the wrong legal standard." ***Piakoski***, 275 Wis. 2d 650, ¶30.

## DISCUSSION

¶39 Civil litigation, while not always orderly, must follow certain rules—aptly named the Rules of Civil Procedure.[20] ***City of Morgantown, W. Va. v. Royal Ins. Co.***, 337 U.S. 254, 257 (1949) ("Their purpose, among others, was 'to secure the just, speedy, and inexpensive determination of every action,' ... and to that end they prescribed identical procedure for all actions, whether cognizable formerly at law or in equity."); *see* ***Surowitz v. Hilton Hotels Corp.***, 383 U.S. 363, 373 (1966) ("These rules were designed in large part to get away from some of the old procedural booby traps which common-law pleaders could set to prevent unsophisticated litigants from ever having their day in court."). The rules are the result of years of review by the legislature and Wisconsin appellate courts.

¶40 Basically, these rules establish a level playing field to afford no advantage to either party. ***Sutton Place Devel. Co. v. Abacus Mortg. Inv. Co.***,

---

[20] Federal cases that interpret federal rules that mirror Wisconsin rules are persuasive authority for Wisconsin courts. ***State v. Copeland***, 2011 WI App 28, ¶17, n.9, 332 Wis. 2d 283, 798 N.W.2d 250 ("Where, as here, a 'state rule mirrors the federal rule, we consider federal cases interpreting the rule to be persuasive authority.'" (citation omitted)); ***State v. Poly-America, Inc.***, 164 Wis. 2d 238, 246, 474 N.W.2d 770 (Ct. App. 1991) ("When a state statute is modeled after a federal rule, we look to the federal interpretation of that rule for guidance and assistance.").

826 F.2d 637, 640 (7th Cir. 1987) ("However, it must be remembered that the … rules [of civil procedure] are carefully-crafted instruments designed to achieve, by their uniform application, fairness and expedition in the conduct of … litigation."). The courts, acting as the arbiter of these rules, must take care that they are not only followed, but are evenly and fairly administered. "If rules of procedure work as they should in an honest and fair judicial system, they not only permit, but should as nearly as possible guarantee that bona fide complaints be carried to an adjudication on the merits." *Surowitz*, 383 U.S. at 373. The rules of civil procedure were "written to further, not defeat the ends of justice." *Id.* The same applies specifically with our state's pleading statutes, "which direct that they be construed as to do substantial justice." *Honeycrest Farms, Inc. v. Brave Harvestore Systems, Inc.*, 200 Wis. 2d 256, 267, 546 N.W.2d 192 (Ct. App. 1996); *see* WIS. STAT. § 802.02(6).

¶41 In this case, several rules of civil procedure were not followed, and the scales of justice were consistently tilted in favor of one party to the real and great prejudice to other parties. The trial court wandered from the proper, legal, and level playing field required under the rules, causing it to unevenly or inappropriately apply the law, resulting in it erroneously exercising its discretion under facts that did not support its decisions.[21]

---

[21] We do note that some aspects of the trial court's erroneous decisions could have arisen due to the extended nature of multiple bench trials in this case as well as the misstatements made by the Rueckers's counsel. *See* Concurrence.

## I. Personal jurisdiction over Lowell[22]

¶42    The first issue is whether the circuit court had personal jurisdiction over Lowell. We conclude it did not. Personal jurisdiction is not to be taken lightly. "Uniformity, consistency, and compliance with procedural rules are important aspects of the administration of justice." ***519 Corp. v. DOT***, 92 Wis. 2d 276, 288, 284 N.W.2d 643 (1979). "If the statutory prescriptions to obtain jurisdiction are to be meaningful, they must be unbending." ***Id.*** *See **Studelska v. Avercamp***, 178 Wis. 2d 457, 460-65, 504 N.W.2d 125 (Ct. App. 1993) (explaining that the court lacked personal jurisdiction, and proper service of an amended summons and complaint could not correct a defect in service where the original summons, albeit served, was not authenticated).

¶43    Trial courts, under clear constitutional direction, may only exercise jurisdiction over individuals who are properly served and properly appear before that court. WIS. STAT. §§ 801.02(1) and 803.05(1) (statutory requirement that an authenticated summons and complaint [or third-party complaint] must be served upon the defendant [or third-party defendant] within 90 days after filing). "Service of summons is the means by which a court obtains personal jurisdiction

---

[22] We reject the Rueckers's argument that lack of personal jurisdiction is being raised for the first time on appeal and that our consideration of it on appeal constitutes a "blindside" to the trial court. *See **Schonscheck v. Paccor, Inc.***, 2003 WI App 79, ¶11, 261 Wis. 2d 769, 661 N.W.2d 476.

In the trial court, Lowell objected—repeatedly and vociferously—to his inclusion as a party. He contended the court had failed to obtain personal jurisdiction over him at any point in time. The Rueckers even concede that Lowell wrote to object that the Amended Third-Party Complaint was "illegal" and that Lowell argued in opposition to the amendment. This issue, therefore, was adequately presented below. Further, we may consider a new argument on an issue that was properly raised below so long as this does not "blindside trial courts with reversals based on theories which did not originate in their forum." ***Gibson v. Overnite Transp. Co.***, 2003 WI App 210, ¶9, 267 Wis. 2d 429, 671 N.W.2d 388 (citation omitted).

over a person." ***All Star Rent A Car, Inc. v. DOT***, 2006 WI 85, ¶58, 292 Wis. 2d 615, 716 N.W.2d 506; *see also* ***Hagen v. City of Milwaukee Employes' Ret. Sys. Annuity & Pension Bd.***, 2003 WI 56, ¶¶12-13, 262 Wis. 2d 113, 663 N.W.2d 268.

¶44 Absent that timely service of the summons, a court lacks personal jurisdiction over a party, ***Id.***, ¶13, and has no legal authority to act with respect to that party, much less make findings of fact, assert conclusions of law, or enter a judgment impacting that party. *See* WIS. STAT. § 801.04(2).

### A. Statutorily-mandated service within 90 days

¶45 During the 90 days after the initiating pleading has been filed, statutory service can be accomplished several ways including personal service upon the person pursuant to WIS. STAT. § 801.11(1), or, after reasonable diligence, by publication and mailing as outlined in WIS. STAT. ch. 985. "Failure to obtain personal jurisdiction over the [third-party] defendant by statutorily proper service of process is a fundamental defect fatal to the action, regardless of prejudice." ***Hagen***, 262 Wis. 2d 113, ¶13. A failure to timely serve a pleading "deprives the [trial] court of personal jurisdiction over the [third-party] defendant and renders the original pleading a legal nullity." ***Bartels v. Rural Mut. Ins. Co.***, 2004 WI App 166, ¶16, 275 Wis. 2d 730, 687 N.W.2d 84.

¶46 Simply knowing that the third-party complaint has been filed "is not equivalent to service." ***Heaston v. Austin***, 47 Wis. 2d 67, 71, 176 N.W.2d 309 (1970). We "require[] strict compliance with [the] rules of statutory service, even though the consequences may appear to be harsh." ***Johnson v. Cintas Corp. No. 2***, 2012 WI 31, ¶25, 339 Wis. 2d 493, 811 N.W.2d 756; ***Dietrich v. Elliott***, 190 Wis. 2d 816, 827, 528 N.W.2d 17 (Ct. App. 1995). *See also* ***Mech v. Borowski***, 116 Wis. 2d 683, 687, 342 N.W.2d 759 (Ct. App. 1983) (stating that the

service of unauthenticated copies of the summons and complaint done before the pleadings were filed with the court was ineffective to confer personal jurisdiction).

¶47 Here, it is undisputed that the Rueckers failed to timely serve Lowell within the statutory 90-day time period. The Rueckers even admitted that they sat on their hands and dithered. When the 90 days was about to expire, the Rueckers tried to arrange for a process server to meet with Lowell on the 88th day. When that failed, they filed an Amended Third-Party Complaint on the 89th day—thinking the filing would give them 90 *more* days to accomplish service. Service had to have been accomplished by the 90th day—it was not. "A court cannot acquire jurisdiction of an action by amending a process in order to give it such jurisdiction." *Rosenthal v. Rosenthal*, 12 Wis. 2d 190, 196, 107 N.W.2d 204 (1961).[23]

¶48 The facts in this appeal are similar to those in *Bartels*, 275 Wis. 2d 730, where the party's failure to timely serve an original summons and complaint was deemed a "fundamental failure" – one that could not be corrected with an amended pleading, for the following reasons:

> Given the nature and consequences of a fundamental defect, we conclude a fundamental defect cannot be remedied with an amended pleading. To conclude otherwise would furnish a complainant with a loophole in which the consequences of failing to follow the strictures for commencing an action are removed. In those circumstances, fundamental defects become less significant than even technical defects; they simply become incidental defects, defects that are rendered inconsequential by merely

---

[23] In *Rosenthal v. Rosenthal*, 12 Wis. 2d 190, 196, 107 N.W.2d 204 (Ct. App. 1961), the plaintiff argued that the trial court should have allowed her to amend her action for support (which required in-Wisconsin service) to an action for legal separation (which allowed out-of-Wisconsin service).

> following the procedure for amending a pleading. Furnishing a complainant with an escape of this sort is not only inimical to the idea of fundamental defects, it would contravene their consequences.

*Id.*, 275 Wis. 2d 730, ¶17 (footnotes omitted).

¶49 The Rueckers assert that because an amended complaint "supplants" or "supersedes" the prior complaint, *Useni*, 264 Wis. 2d 783, ¶¶9-11 and *Ness v. Digital Dial Communications, Inc.*, 222 Wis. 2d 374, 380, 588 N.W.2d 63 (Ct. App. 1998), the Amended Third-Party Complaint became the operative complaint and was effective to bestow personal jurisdiction over Lowell if it was served within a new 90-day window.

¶50 Neither opinion has any bearing on the facts in this case where the original third-party complaint was *never* served upon Lowell. In *Useni*, the defendant "was properly served with the original summons and complaint[.]" *Useni*, 264 Wis. 2d 783, ¶9. And, in *Ness* where the defendant was properly served with a summons and complaint, the issue centered only upon when an amended complaint takes effect. *Ness*, 222 Wis. 2d at 382. When the defaulting party tried to answer an amended complaint in an effort to cure a default that existed when the amended complaint was filed, our supreme court concluded that a party was not able to overcome a defect (the failure to answer an initial pleading) by relying upon a subsequent pleading. *Ness v. Digital Dial Commc'ns, Inc.,* 227 Wis. 2d 592, ¶16, 596 N.W.2d 365 (1999). The court relied upon WIS. STAT. § 801.14(1) which requires all pleadings to "be served on every party," *id.*, ¶17, and explained that service is an integral part of civil procedure:

> Our analysis centers on the role service plays in the course of an action. A civil action seeking a personal judgment is commenced upon the filing of a summons and a complaint with the circuit court; additionally, a defendant must be served with an authenticated copy of the summons and complaint within [90] days of the filing. As such, both

> filing and service are necessary to properly commence an action. ... The purpose of service of summons or process is to provide adequate notice to a party of the commencement of an action against it, fulfilling a party's right to constitutional due process of law, as well as to confer personal jurisdiction on the court over the person served.

*Id.*, ¶18 (citations omitted).

¶51 Our state supreme court, in *Ness*, further concluded that "[a] party in default for failing to answer forfeits its due process right to notice of further pleadings." *Id.*, ¶19. Thus, just as a defaulting defendant cannot revive its right to answer, so is a non-serving plaintiff not able to revive its right to serve the initial summons and complaint. Based upon *Bartels* and the other opinions cited herein, once the time period expires and there is no further time to serve (or to answer), that time period may not be extended by the use of an amended pleading.

¶52 This concept is further supported by our opinion in *Bell v. Employers Mutual Casualty Company of Des Moines, Iowa*, 198 Wis. 2d 347, 361, 541 N.W.2d 824 (Ct. App. 1995), where we explained that service of an amended complaint may be made upon a party's attorney if—and only if—the "action has been commenced by filing a summons and complaint," and "provided service of the summons and complaint has been made on the defendant within [90] days of filing ... ." Therefore, once the summons and complaint has been served, the action may proceed. This reaffirms the principle that the service of the initial pleading is a critical step without which no other actions can be taken by the court and that the later filing of an amended complaint cannot resuscitate rights already extinguished by that lack of service.

¶53 Finally, the Rueckers also rely upon *Holman v. Family Health Plan*, 227 Wis. 2d 478, ¶12, 596 N.W.2d 358 (1999) which held that "[w]hen an amended complaint supersedes a prior complaint, the amended complaint becomes the only live, operative complaint in the case on which default judgment can be

entered." The court in **Holman** further elaborated that plaintiffs, albeit in the context of amended pleadings, must comply with the "minimal service requirements" and may not "benefit from their failure to comply with the rules of service." **Id.**, ¶17. Thus, this opinion, as well, does not bolster the Rueckers's arguments on personal jurisdiction because there was no service on Lowell and, thus, there was no live, operative third-party complaint which could be superseded.

¶54 Filing an amended pleading right before the 90-day window expires does not "restart" a service clock for the initial pleading. To hold otherwise would effectively eviscerate the statutory service time period and would resurrect an "untimely" service period. "Failure to serve an authenticated copy of a complaint is a *fundamental* procedural error that requires dismissal because it denies the court jurisdiction over the defendant." **The Landings LLC v. City of Waupaca**, 2005 WI App 181, ¶9, 287 Wis. 2d 120, 703 N.W.2d 689 (emphasis added); *see* **American Fam. Mut. Ins. Co. v. Royal Ins. Co. of Am.**, 167 Wis. 2d 524, 533-34, 481 N.W.2d 629 (1992). There was a fundamental defect here.

¶55 In allowing the amendment, the trial court erred. It failed to recognize a basic foundational principle: a party cannot amend a pleading that is not live or operative. By their failure to serve Lowell with the initial third-party complaint within the requisite 90 days, the Rueckers failed to bring Lowell within the court's jurisdiction, and the initial pleading became a legal nullity. Neither the Rueckers nor the court, could extend that 90 days. *See* **Bartels**, 275 Wis. 2d 730, ¶16; *see* WIS. STAT. § 801.15(2)(a).

### B. Waiver of lack of personal jurisdiction

¶56 The Rueckers claim that Lowell waived his right to challenge personal jurisdiction. We disagree. It is clear from the Record that Lowell maintained his objection to personal jurisdiction. Even after the trial court, in an attempt to not "allow procedure to overcome what would be an injustice," found that the Amended Third-Party Complaint was properly filed in a manner that extended the time for service of the initial pleading, Lowell's counsel still refused to sign an admission of service form. Despite that refusal, the court told the parties that it was proceeding forward with the trial and that Lowell's personal liability was properly before the court.

¶57 In an effort to forestall the introduction of any further testimony (and the need to bring Lowell back to the courtroom), LMS's counsel rested its case. That should have ended the matter. But, the trial court again allowed the Rueckers to ignore the rules of civil procedure. It permitted the Rueckers to recall their expert to the stand after the taking of evidence had concluded and no new facts had been "adduced" in a rebuttal; the court, therefore, erred in allowing the Rueckers to call a surrebuttal witness. *See In re Kamesar's Estate*, 81 Wis. 2d 151, 168, 259 N.W.2d 733 (1977) ("Surrebuttal is proper when facts are introduced for the first time on rebuttal.").

¶58 A waiver of personal jurisdiction requires a knowing relinquishment of that right. *Loren Imhoff Homebuilder, Inc. v. Taylor*, 2022 WI 12, ¶15, 400 Wis. 2d 611, 970 N.W.2d 831. Here, the facts show that Lowell only admitted service because the trial court's errors forced his hand. The admission of service was signed on behalf of Lowell *solely* as to the Amended Third-Party Complaint. At no point did Lowell relinquish any right to service of the initial pleading. His

counsel only signed the admission of service *after* the trial court had already ruled—over his multiple objections—that it *had* personal jurisdiction over Lowell and that the case *was* proceeding forward.[24]

### C. Lack of personal jurisdiction

¶59 As explained above, the rules of civil procedure are clear. The Rueckers failed, as required by statute, to serve the third-party complaint upon Lowell within 90 days after it was filed. Thus, the initial third-party complaint was void as a legal nullity meaning there was no valid complaint for the Rueckers to amend.

¶60 Accordingly, the Amended Third-Party Complaint is also void as a legal nullity. The trial court did not obtain personal jurisdiction over Lowell under either pleading. It necessarily follows that the personal judgments against Lowell are void. We remand this cause to the court with instructions to dismiss Lowell as a party and vacate all judgments against Lowell.[25]

---

[24] We also conclude that the Rueckers are equitably estopped from arguing waiver based upon the admission of service. *See Sacotte v. Ideal-Werk Krug & Priester Machinen-Fabrik*, 119 Wis. 2d 14, 17-18, 349 N.W.2d 701 (Ct. App. 1984) ("While equitable estoppel may block a party's use of affirmative defenses, we reject the contention that equitable estoppel can also be used as a basis for personal jurisdiction where some basis for personal jurisdiction does not already appear as of record."). *See Wosinski v. Advance Cast Stone Co.*, 2017 WI App 51, ¶40, 377 Wis. 2d 596, 901 N.W.2d 797 (explaining that equitable estoppel bars legal arguments of a party that acted in a manner that induced reasonable reliance on the part of another party to that party's detriment).

[25] Lowell further argues the initial third-party complaint "is void ab initio because the Rueckers lacked leave" to implead new parties. He also argues that the Amended Third-Party Complaint "relates back to the date of the filing of the original" pursuant to WIS. STAT. § 802.09(3). Having concluded that the 90-day time period could not be enlarged, that Lowell had not been timely served, and that the trial court never obtained personal jurisdiction over Lowell, we need not address these other arguments. *See Sweet v. Berge*, 113 Wis. 2d 61, 67, 334 N.W.2d 559 (Ct. App. 1983) (explaining that when one issue is dispositive of an appeal, we need not discuss other issues).

## II.     The mid-trial amendment[26]

¶61     LMS asserts that the succession of amended pleadings against it was unfairly prejudicial and the trial court's orders granting each amendment were either void ab initio or subject to reversal as discretionary errors.  The Rueckers counter that the amended counterclaims—HIPA and slander of title—were properly allowed as they conformed to the evidence, that LMS did not object, and that LMS had a full and fair opportunity to brief, argue, and defend against the new claims.  They further assert that this failure to object constitutes a waiver of the issue on appeal.

¶62     First, we conclude, as we did above, that this amendment issue was not waived by LMS and is properly before this court.  We further conclude that the decision to permit amended counterclaims near the conclusion of the original bench trial was an erroneous exercise of discretion because the trial court did not properly apply the law.

### A. The trial court's discretion regarding amended pleadings

¶63     Trial courts have considerable discretion to permit amendments to pleadings.  *See* WIS. STAT. § 802.09.  They may even informally or *sua sponte* amend complaints to conform to the evidence, provided the opposing party suffers no prejudice.  ***Schultz v. Trascher***, 2002 WI App 4, ¶¶14, 21, 249 Wis. 2d 722, 640 N.W.2d 130 (2001).  "The trial court 'in exercising its discretion must balance

---

[26] Having already concluded that the trial court never obtained personal jurisdiction over Lowell, the question of whether the First Amended, and Second Amended Third-Party Complaints were properly allowed is moot.  We will not address arguments concerning Lowell any further and will only consider the issues with respect to LMS.  *See **id.***

the interests of the party benefiting by the amendment and those of the objecting party.'" ***Piakoski***, 275 Wis. 2d 650, ¶30 (quoting ***State v. Peterson***, 104 Wis. 2d 616, 634, 312 N.W.2d 784 (1981)). Courts are to liberally construe § 802.09(2) to permit amendments if it does not unfairly deprive the opposing party of an opportunity to present evidence on that issue. *See **Zobel v. Fenendael***, 127 Wis. 2d 382, 393, 379 N.W.2d 887 (Ct. App. 1985). When considering whether to allow a late amendment to a complaint, courts look to "whether the party opposing amendment has been given such notice of the operative facts which form the basis for the claim as to enable [it] to prepare a defense or response." ***Carl v. Spickler Enters., Ltd.***, 165 Wis. 2d 611, 623, 478 N.W.2d 48 (Ct. App. 1991) (citation omitted). Amendments are not to be granted unless such an opportunity has been provided. *See **id.***

¶64 Parties may amend pleadings under one of several avenues.[27] One way to obtain leave of court is to seek an amendment order under WIS. STAT. § 802.09(2). "If issues not raised by the pleadings are tried by express or implied consent of the parties" and the party moves to conform the pleadings to the

---

[27] Any time during the first six months after a pleading is filed, a party may amend at their own discretion. WIS. STAT. § 802.09(1). The Rueckers did not permissively amend. If a party fails to permissively amend during that timeframe, leave of the court is required. ***Id.*** A court may also extend the six-month time period by scheduling order. ***Id.*** That did not happen here. During the course of litigation, the parties stipulated to four scheduling orders; none of those stipulated orders reopened or extended the time to amend a pleading.

In order to amend a pleading after six months, a party may file a motion seeking leave of the court pursuant to WIS. STAT. § 802.09(1). Resolution of such a motion requires the trial court to "balance the interests of the party benefiting by the amendment and those of the objecting party." ***Piaskoski & Assoc. v. Ricciardi***, 2004 WI App 152, ¶30, 275 Wis. 2d 650, 686 N.W.2d 675. The court must consider various factors including timely notice to the adverse party that the claim may be brought and consideration of the adverse party's preparedness to defend against the claim. *See **Finley v. Culligan***, 201 Wis. 2d 611, 629-30, 548 N.W.2d 854 (Ct. App. 1996). The Rueckers did not move the court under this statutory subsection, nor did the court reference any of the various relevant considerations when it granted their motion.

evidence, the trial court may grant the motion. *Id.* Therefore, some form of consent is necessary. The Rueckers's oral mid-trial motion sought precisely that and was made under this statutory subsection solely with respect to "two claims to be added to the Rueckers'[s] counterclaim."

### B. Lack of consent and the "interests of justice"

¶65 Before it granted the Rueckers's motion, the trial court was required to find that LMS had either expressly or impliedly consented to trial on the additional claims. *See Hess v. Fernandez*, 2005 WI 19, ¶14, 278 Wis. 2d 283, 692 N.W.2d 655. "If, on the other hand, the [trial] court finds that there was no consent to the trial of the unpleaded issue, it must apply a balancing test and make an 'interests of justice' determination." *Id.* at ¶14 (quoting *Zobel*, 127 Wis. 2d at 390). The Rueckers imply that LMS clearly or expressly consented to the addition of HIPA and slander of title. We disagree because the trial court never conducted this analysis, nor did the court engage in an "interests of justice" test and consider the prejudice to LMS.[28]

¶66 The Record establishes that LMS *did* object to the amendment. Its counsel explained:

> With regard to the slander of title, ... I don't believe there's been any evidence elicited as to a false, sham, or frivolous nature of the case. Furthermore, your Honor, if -- if I'd have known that was part of one of the issues that was

---

[28] Even if there was no consent, LMS clearly objected to the amendments and, per WIS. STAT. § 802.09(2), the trial court had to consider whether LMS had "show[n] that the amendment would be prejudicial to its continued maintenance of the case." *See Hess v. Fernandez*, 2005 WI 19, ¶15, 278 Wis. 2d 283, 692 N.W.2d 655. No balancing of LMS's objection and its stated prejudice was done by the court. Had the court conducted that analysis, we conclude the "interests of justice" would have mandated that the pleadings against LMS not be amended.

going to come -- to come up, we would have presented the case differently in terms of that -- those particular issues.

The same thing with regarding to the ATCP claims ... .

In any event, your Honor, I guess my point is is that we would have presented our case differently. We would have -- we would have approached it differently. We certainly would have called additional witnesses had I known that either of these issues were on the table.

And the fact is as it is, I understand that you have the discretion to do it. But it's not a mandatory type of thing. And certainly without giving us an opportunity to present counterevidence, I don't think it would be appropriate, your Honor.

¶67 Express consent is "that which 'may be given by stipulation, or may be incorporated in a pre-trial order and rarely raises any serious fact question.'" *Hess*, 278 Wis. 2d 283, ¶19 (quoting *Peterson*, 104 Wis. 2d at 630, n.17); *see Zobel*, 127 Wis. 2d 382, 392-93. We conclude that there was no express consent by LMS to the amended counterclaims. Thus, the question is whether there was implied consent. "[I]mplied consent is generally held to exist where there is no objection to the introduction of evidence on the unpleaded issue and where the party not objecting is aware that the evidence goes to the unpleaded issue: actual notice to the parties appears to be the key factor in determining whether there was implied consent." *Peterson*, 104 Wis. 2d at 630. "To find implied consent it must appear that parties understood the evidence was aimed at the unpleaded issue." *Id.* "To determine implied consent, the court must use the test of actual notice, and if it finds no actual notice, it should find no implied consent to try the unpleaded issue." *Hess*, 278 Wis. 2d 283, ¶14. If consent is found, the court must then permit the moving party to amend its pleading to conform to the proof. *Peterson*, 104 Wis. 2d at 631; *Zobel*, 127 Wis. 2d at 387-88. "[T]here should be evidence in the record that discretion was in fact exercised and the basis of that exercise of discretion should be set forth." *State v. Hutnik*, 39 Wis. 2d 754, 764, 159 N.W.2d 733 (1968). We are cognizant that such an exercise "incorporates a process of

reasoning and proper explanation." ***State v. X.S.***, 2022 WI 49, ¶33, 402 Wis. 2d 481, 976 N.W.2d 425 (citation omitted). "This process must depend on facts that are of record or that are reasonably derived by inference from the record and a conclusion based on a logical rationale founded upon proper legal standards." ***State v. Salas Gayton***, 2016 WI 58, ¶19, 370 Wis. 2d 264, 882 N.W.2d 459 (citation omitted).

¶68     When the Rueckers made their first oral motion to amend their pleadings to add new claims against LMS pursuant to WIS. STAT. § 802.09(2), the trial court did not make any findings as to LMS's implied consent[29] to try the new claims, and, aside from mentioning prejudice to LMS in general, it did not evaluate what the prejudice entailed (the lack of discovery and motion practice, the fact that testimony was already made on the record, and that the inclusion of potential double damages at the end of litigation prevented accurate risk assessments and negotiation opportunities).  LMS had already fashioned its examinations and introduction of evidence based on the existing causes of action and had no time to research the new legal theories, conduct discovery, or file dispositive motions.  Lowell had already concluded his testimony without the opportunity to tailor his statements to defend against the new and exponentially greater damage claims.

¶69     Contrary to the Rueckers's arguments on appeal, the trial court *never* considered whether LMS consented to the amended counterclaims.  It never considered whether LMS had been "*reasonably* alerted" or "properly apprised"

---

[29] In the context of whether Lowell gave express consent to the addition of the new claims, the trial court concluded that he did not.  The court, however, did not ever evaluate whether LMS expressly or impliedly consented to the amended counterclaims.

that additional issues were being tried against it in the initial five-day trial. *See Finley*, 201 Wis. 2d at 628-29. Moreover, there can be no implied consent if an unpleaded claim "piggybacks" off the claims previously in the case that have been pled and tried. *Id.* When there is that type of overlap, the defending party lacks fair notice of newly-sprung claims when almost all of the evidence has been presented. Trial courts are to "properly hold the parties to the litigation tactics and strategies which they have pursued" in their case-in-chief "especially so in an involved, complicated and already lengthy case ... which was on the brink of [a verdict] when the new issue[s were] introduced." *See id.* at 630. Springing these new counterclaims, together with their concomitant new levels of damages, at the conclusion of what the Rueckers called "a simple breach of contract case" fails to meet the fair, level-playing field goals necessary in civil litigation.

¶70    At no point did the trial court fully contemplate the factors at issue in a motion to amend to conform the pleadings with respect to consent and notice. At no point did the court conduct an "interests of justice" analysis following LMS's objections. *See* WIS. STAT. § 802.09(2). These were errors of law. Accordingly, we reverse and hold that the amended counterclaims against LMS must be struck.[30]

### III.    HIPA's major renovation exception

¶71    Both the Rueckers and LMS assert that the question of HIPA's major renovation exception is necessary for a full resolution of this appeal. We

---

[30] LMS further argues that, per WIS. STAT. § 801.15(2)(a), the Rueckers were was also required to articulate "excusable neglect" to permit the belated amended pleadings. Having already concluded that the trial court did not properly allow the amended counterclaims, we need not address this issue. *See Sweet*, 113 Wis. 2d at 67.

agree because this matter will be remanded to the trial court, and guidance to assist in the re-calculation of damages is needed. We conclude, as a matter of first impression, that HIPA's major renovation exception applies to the LMS "not to exceed" contract and that the trial court erred by holding to the contrary.

¶72 HIPA, and its major renovation exception, are not statutes, but like review of a statute, our review is conducted under a de novo standard. *See Menasha*, 311 Wis. 2d 579, ¶44. That is because "'when interpreting administrative regulations, we use the same rules of interpretation as we apply to statutes.'" *Id.*, ¶45 (quoting *Daimler Chrysler v. LIRC*, 2007 WI 15, ¶10, 299 Wis. 2d 1, 727 N.W.2d 311); *see Security Health Plan of Wis. Inc. v. American Standard Ins. Co. of Wis.*, 2018 WI App 68, ¶21, 384 Wis. 2d 545, 920 N.W.2d 340.

## A. History, timing of application, and total price of contract

¶73 First enacted[31] in 1974, HIPA, by its terms, applies only to "home improvement contract[s.]" WIS. ADMIN. CODE § ATCP 110.01(4). Those contracts are defined as an "agreement between a seller and an owner ... under which the seller is to perform labor or render services for home improvements, or furnish materials in connection therewith." *Id.* "The HIPA was intended to curb unscrupulous business tactics that cause financial distress to both consumers and to persons engaged in legitimate businesses." *Stuart v. Weisflog's Showroom Gallery, Inc.*, 2008 WI 22, ¶28, 308 Wis. 2d 103, 746 N.W.2d 762.

---

[31] *See* Wis. Admin. Reg. 1 (June 1, 1974).

¶74    In 2014, the Department of Agriculture, Trade and Consumer Protection (DATCP) enacted an exception to the regulations which excluded "the Major Renovation of an existing structure" from its parameters.  WIS. ADMIN. CODE § ATCP 110.01(2m).  That exception provides: "'Major Renovation of an existing structure' means a renovation or reconstruction contract where the total price of the contract is more than the assessed value of the existing structure at the time the contract is initiated."  This amendment to HIPA established that "the rights and duties contained in ATCP 110 would not apply to very large home improvement projects, defined as those where the value of the project is more than the assessed value of the existing structure."[32]  DATCP, Docket No. 12-R-08, at 2, Rules Clearinghouse No. 13-066, Proposed Final Draft (October 30, 2013).[33]  The new section was created so that:

> General contractors working on significant reconstruction projects would no longer be regulated under this proposed rule.  Currently, [c]h. ATCP 110 does not regulate new home construction but it does regulate home improvement projects.  Under this proposal, major reconstructions – those projects where the price of the contract is greater than the assessed value of the preexisting structure [–] would be treated like new home construction.

¶75    A plain reading of the major renovation exception shows that it carves out major projects while still maintaining protections for standard home improvements.  This exception was available when the LMS contract was signed.

---

[32] This corresponds to the testimony of LMS's attorney expert who opined that the original "intent of the home improvement practices act was to apply to home improvement and remodeling.  It never did apply and was never intended to apply to new construction."

[33] This court may consider enactment history when determining how to interpret administrative code sections.  *See Fleming v. Amateur Athletic Union of U.S., Inc.*, 2023 WI 40, ¶33, 407 Wis. 2d 273, 990 N.W.2d 244 (stating courts may consult legislative history "to confirm the plain meaning" of a statute or administrative code section).

¶76 The timing of the assessment to determine the applicability of this exception was an issue throughout the lower court proceedings. The language of the exception unequivocally provides that it is to be assessed *at the time the contract is initiated*. WIS. ADMIN. CODE § ATCP 110.01(2m). Albeit at the very tail-end of the present litigation, all parties now agree that this is the correct time frame and that reductions from the total price at date of contract are not permissible. It is not the price during or at the end of the contract, nor may a court deduct from the contract's total price any amounts for unsatisfactory or incomplete work. In this appeal, all parties also concede that the assessed value of the structure at hand was $415,600 when the contract was signed.

¶77 What constitutes the "total price" of the LMS contract is the key question.[34] The controversy arises because the LMS contract calls itself a "not to exceed" contract even though it contains a very specific and set total price. The Rueckers assert that the LMS contract does not contain a total price for the contract for several reasons: (1) the designation label of the contract itself; (2) their expert's opinion that "not to exceed" contracts are not within the contemplation of the exception; and (3) reliance upon the BCP email that dovetails

---

[34] The Rueckers rely upon three cases to argue that "total price" of a construction contract has a "well-established meaning"—a meaning that does not include a "not to exceed" or cost-plus contract. *See Central Refrigeration v. Monroe*, 259 Wis. 23, 47 N.W.2d 438 (1951); *United States ex rel. Patzer v. Sikorsky Aircraft Corp.*, 571 F. Supp. 3d 979 (E.D. Wis. 2021); and *RMS of Wis., Inc. v. S-K JV*, No. 13-CV-1071, 2015 WL 9592520 (E.D. Wis. Dec. 31, 2015). First, in *Central Refrigeration*, there was no written contract, so its holding is not relevant. 259 Wis. at 24. Second, in *Patzer*, the dispute centered upon an agreement without any set price that arguably allowed a government contractor to add markups to vendor quotes. 571 F. Supp. 3d at 994-95. And, the reference in *RMS*, 2015 WL 9592520, at *6, that "[g]enerally construction contracts are either fixed price contracts, ... or time and materials contracts ... " is a quote from an Indiana text. Here, the LMS contract falls outside any general rule. Finally, the cited reference does not apply to the current appeal, and *RMS* holds no precedential value in our court. *Lomax v. Fiedler*, 204 Wis. 2d 196, 217, 554 N.W.2d 841 (Ct. App. 1996) (explaining that federal district court decisions are not binding on state courts).

with that opinion. The Rueckers assert that "[w]here, as here, a contract does not set a fixed price but is a not-to-exceed and/or cost-plus contract, the total price is not known at the outset of the contract." We disagree. Simply because a contract is labeled "not to exceed" or "cost-plus" does not necessarily establish that the total price of the contract is not known at the date of contracting. An examination of the contract itself is necessary.

### B. The contract's language and the parties' conduct

¶78    "[W]e interpret the plain language of a contract 'consistent with what a reasonable person would understand the words to mean under the circumstances.'" *Marx v. Morris*, 2019 WI 34, ¶63, 386 Wis. 2d 122, 925 N.W.2d 112 (quoting *Maryland Arms Ltd. P'ship v. Connell*, 2010 WI 64, ¶22, 326 Wis. 2d 300, 786 N.W.2d 15); *see Bitker & Gerner Co. v. Green Inv. Co.*, 273 Wis. 116, 120, 76 N.W.2d 549 (1956). The LMS construction contract to renovate the Rueckers's house is labeled a "NOT TO EXCEED CONTRACT." But, it identifies "THE CONTRACT PRICE" as $511,331.15. It also incorporates a "Construction Proposal" that itemizes the price for each and every item. Contrary to the hypothetical scenario presented to the BCP agent, this is not a contract with a hypothetical, rounded figure—such as $500,000. This is a contract that is as precise as any other contract with a set, itemized, total price.

¶79    The course of conduct between LMS and the Rueckers is further evidence that the contract had an established total price as of its signing. First, four of the five progress billing statements each identified the "Original Contract" amount as $511,331.15. They were not generalized nor did they identify a tentative total figure. As well, in an affidavit, Matthew Ruecker acknowledges that the contract had a "total cost of $511,331.15" and in his trial testimony he

calls it a "final not-to-exceed contract price" that "cost as much as the home." Dawn Ruecker testified that the contract "price is now $511,331.15." And, the Rueckers's initial briefs (in opposition to LMS's summary judgment motion and in support of their own motion), described the case as one in which "[o]n a $511,331.15 contract, only $60,234.52 remains unpaid." All parties agreed there was a total price until the Rueckers altered course mid-trial.[35]

¶80 Essentially, the Rueckers switched horses mid-stream and began to assert that "not to exceed" contracts are never within the contemplation of the exception and that the total price was never fixed.[36] It was also only after the trial court allowed the Rueckers to recall their expert witness and bring in another attorney expert that the Rueckers were able to present evidence to support this new theme of their case.

### C. Application of HIPA's major renovation exception

¶81 The trial court, relying specifically on the BCP email (on its own and not as part of another expert's foundation), concluded in its written decision that

---

[35] In addition, the Rueckers and the trial court erroneously relied upon the unsupported hearsay contained in the BCP email. The statement in that email was made in response to a single hypothetical question and was relied upon despite the fact that there was no inquiry of, or clarification by, its drafter. There was no vigorous cross-examination to probe whether the statement is worthy of any weight by the trier of fact. Had it been, the BCP agent would most likely have been asked if the exception applied not if the contract was for $500,000, but rather was for a fixed, cost-itemized total of $511,331.15. Regardless of how that individual would have answered this question, we still conclude that a fixed, total contract price trumps a "not to exceed" label.

[36] This recharacterization of their position was one that the Rueckers's attorney admitted he struggled with and, only after "a moral debate of what to do" was he finally comfortable enough that he felt he could "present those in good faith." Although, it is not stated, implicit in that statement is the premise that the attorney had that moral debate for about 87 days after which he finally attempted to serve Lowell.

"a specific price need[ed] to be stated in the contract" and that the LMS contract contained "uncertainty[.]" We are not certain where that uncertainty lies because the LMS contract *does* contain a "specific price." The trial court erred in its analysis.

¶82 We have long eschewed the concept that "magic words" need to be used or uttered. *State v. Brown*, 2020 WI 63, ¶27, 392 Wis. 2d 454, 945 N.W.2d 584 ("The law generally rejects imposing 'magic words' requirements."); *see Patchak v. Zinke*, 583 U.S. 244, 251 (2018) (noting that the Supreme Court refrains from reading statutes to "incant magic words" (citation omitted)). The same would apply for titles or headings.[37] Here, the parties bargained for the renovation construction contract and agreed on a specific, fixed, total price. Simply including the phrase "not to exceed" does not magically alter these intrinsic facts.

¶83 Following *State ex rel. Kalal v. Circuit Court for Dane County*, 2004 WI 58, ¶48, 271 Wis. 2d 633, 681 N.W.2d 110, we look to the "scope, context, and purpose ... ascertainable from the text and structure" of the administrative code because they "are perfectly relevant to a plain-meaning interpretation." "When construing contracts that were freely entered into, our goal 'is to ascertain the true intentions of the parties as expressed by the contractual

---

[37] We do not use the titles of headings of statutes to "discern meaning" unless "there is ambiguity in the text." *MBS-Certified Pub. Accts, LLC v. Wisconsin Bell Inc.*, 2013 WI App 14, ¶8, 346 Wis. 2d 173, 828 N.W.2d 575. *See* WIS. STAT. § 990.001(6) ("The titles to subchapters, sections, subsections, paragraphs and subdivisions of the statutes and history notes are not part of the statutes."); *Continental Cas. Co. v. Milwaukee Metro. Sewerage Dist.*, 175 Wis. 2d 527, 532, 499 N.W.2d 282 (Ct. App. 1993) (Titles to statutes "may not be considered to create ambiguities relating to statutes being challenged."). While not directly on point, this concept can be analogized here where there is a title or heading that conflicts with a specific total price set out in a contract.

language.'" ***Pheasant West, LLC v. University of Wis. Med. Found., Inc.***, 2023 WI App 55, ¶22, 409 Wis. 2d 539, 998 N.W.2d 600 (quoting ***State ex rel. Journal/Sentinel, Inc. v. Pleva***, 155 Wis. 2d 704, 711, 456 N.W.2d 359 (1990)). This is because "[w]e construe the contract language according to its plain or ordinary meaning." ***Pheasant West***, 409 Wis. 2d 539, ¶22 (citing ***Huml v. Vlazny***, 2006 WI 87, ¶52, 293 Wis. 2d 169, 716 N.W.2d 807).

¶84    The plain meaning of the LMS contract was that, for the total price of $511,331.15 as stated twice in the contract and its attachments, LMS agreed to provide a major home renovation for a house that was currently appraised at $415,600.  The Rueckers used that total price as the starting point for reductions in order to lower that price below the house's assessed value during the initial bench trial.  It was only when the Rueckers decided to alter their approach that they focused solely upon the phrase "not to exceed."  We conclude the trial court erred when it ruled that the HIPA major renovation exception did not apply to the LMS contract, and we remand with instructions to vacate those portions of the judgment against LMS for damages and attorneys' fees relating to HIPA.[38]

## CONCLUSION

¶85    The HIPA major renovation exception applies to the "not to exceed" contract underlying this appeal.  The language of the contract, as well as the understanding of all of the parties, evidences that—as of the date of the contract—

---

[38] Much ink has been spilled, and significant oral argument raised, as to whether the slander of title damages were properly doubled under HIPA (had it applied here) and whether the damages for slander of title include attorneys' fees.  Based upon this court's conclusions that HIPA does not apply and that the slander of title amended counterclaim was improperly impleaded, we need not—and do not—address either damage issue. *See* ***Sweet***, 113 Wis. 2d at 67.  These damages are no longer applicable.

there was a sufficiently identified, exact, and discrete total price for the work that exceeded the then-assessed value of the house. Accordingly, the trial court erred, as a matter of law, when it held that the HIPA exception did not apply and that LMS (and Lowell) were liable for damages with respect to violations of HIPA. It follows that the court also erred when it doubled damages under HIPA.

¶86 Moreover, the trial court never obtained personal jurisdiction over Lowell with respect to the initial or any Amended Third-Party Complaint and the court erred by not dismissing him based upon that fundamental defect. Finally, the court erroneously exercised its discretion by allowing the Rueckers to amend the pleadings to add new counterclaims against LMS at the conclusion of the initial trial.

¶87 Based upon the foregoing, the cause is remanded to the trial court to dismiss Scott Lowell from this action, to vacate all judgments against Lowell personally, and to vacate the judgments against Lowell Management Services, Inc. with respect to HIPA and slander of title.[39] The court is further instructed to review the award of attorneys' fees to the Rueckers and to assess only those attributable to the breach of contract claim against LMS.

---

[39] Only in the Reply Brief do LMS and Lowell raise the request that this court dismiss the HIPA and slander of title claims *with* prejudice as opposed to *without* prejudice. The request was also raised briefly in oral argument. Due to the lack of briefing on this issue, we leave this matter for the trial court on remand. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) ("Arguments unsupported by references to legal authority will not be considered.").

*By the Court.*—Judgment reversed and cause remanded with instructions.

Recommended for publication in the official reports.

No.    2024AP4(C)


¶88    GROGAN, J.    (*concurring*)  WISCONSIN  STAT.  RULE 809.23(3) (2023-24)[1] is clear—an unpublished opinion may not be cited as authority except in the limited circumstances set forth in subsections (3)(a) and (b), none of which apply in this case.  The RULE provides:

> **(3)**  CITATION OF UNPUBLISHED OPINIONS.
>
> **(a)** An unpublished opinion may not be cited in any court of this state as precedent or authority, except to support a claim of claim preclusion, issue preclusion, or the law of the case, and except as provided in par. (b).
>
> **(b)** In addition to the purposes specified in par. (a), *an unpublished opinion issued on or after July 1, 2009, that is authored* by a member of a three-judge panel or by a single judge under s. 752.31 (2) *may be cited for its persuasive value.   A per curiam opinion*, memorandum opinion, summary disposition order, or other order *is not an authored opinion for purposes of this subsection.*  Because an unpublished opinion cited for its persuasive value is not precedent, it is not binding on any court of this state.   A court need not distinguish or otherwise discuss an unpublished opinion and a party has no duty to research or cite it.

RULE 809.23(3)(a)-(b) (emphases added).


¶89    This has been the law for over 15 years.  *See* S. CT. ORDER 08-02, 2009 WI 2 (eff. July 1, 2009).[2]   Despite that, the Matthew D. Ruecker and

---

[1]  All references to the Wisconsin Statutes are to the 2023-24 version.

[2]  *Available                                                                                    at* https://www.wicourts.gov/sc/rulhear/DisplayDocument.pdf?content=pdf&seqNo=35116.

Dawn M. Ruecker Revocable Trust ("Trust") cited a per curiam opinion, ***Berger v. Herb G. Schroeder & Sons, Inc.***, No. 2015AP212, unpublished slip op. (WI App Mar. 16, 2016), in a brief to the circuit court and argued to the court at a hearing that it could rely on ***Berger*** as persuasive authority in rendering a decision on attorney's fees for the slander claim at issue.

¶90 When the circuit court asked Lowell Management Service's, Inc.'s (LMS) attorney what he thought about the ***Berger*** case, LMS's attorney indicated he had not read it. The court then told the parties it wanted to review the ***Berger*** case and it would "then … make a determination on whether fees are allowable."

¶91 After a recess, the following exchange occurred:

> THE COURT: So I reviewed the ***Berger*** case. And firstly, it's an unpublished case, and it's a per curiam decision so it has no precedential value. And it's somewhat dicta.
>
> It does talk about the fact that the claims were for -- there is a slander of title claim in here somewhere. I thought I had it. I can't find it now, so just a moment please. Yes, here it is. Berger sued Schroeder for breach of contract, theft by contractor, slander of title arising from Schroeder's filing of a construction lien against the Bergers' home in violation of consumer protection laws.
>
> Then at a later point, it talks about that the circuit court also awarded the Bergers $1,000 in punitive damages and $45,044 in attorney's fees. So it doesn't come right out and say under 706.13 actual attorney's fees can be awarded. But by implication where the 1,000 punitive damages and the attorney's fees go hand in hand, I think that is implicit.
>
> MR. COLETTI: But, your Honor, can you rely on that when it's a recitation of what a circuit court decision was in an unpublished per curiam opinion?
>
> THE COURT: Not precedential value, but it can be for persuasive value.
>
> MR. COLETTI: I don't think per curiam can be used for that purpose even, your Honor.

THE COURT: I think it can.

MR. MEIER: And, your Honor, the version that we have, it -- it talks about the distinction of is it before or after July 1 of 2009. And this decision came in 2016. So our understanding is if it's a per curiam after July 1 of 2009, it can be used for persuasive authority.

THE COURT: That's what it says in the title, it says unpublished opinions issued before July 1, 2009, are of no precedential value and may not be cited except in limited circumstances. Unpublished opinions issued on or after July 1, 2009, may be cited for a persuasive value, which is what I just said.

MR. COLETTI: Right. But if you read the actual statute, which I can't -- I don't -- it says it excludes almost every case except for ones that are particularly related to that issue, your Honor. Do you have the -- what was --

THE COURT: 809.23(3).

MR. COLETTI: Okay. It says an unpublished opinion may not be cited in any court of this state as precedent or authority except to support a claim of claim preclusion, issue preclusion, or the law of the case and except as provided in paragraph (b). In addition to the purposes specified in paragraph (a), an unpublished opinion issued on or after July 1, 2009, that is authored by a member of a three-judge panel or by a single judge under Section 752.31(2) may be cited for its persuasive value. A per curiam opinion, memorandum opinion, summary disposition order, or other order is not an authored opinion for purposes of this subsection. Because an unpublished opinion cited for its persuasive value is not --

THE COURT: Slow down again.

MR. COLETTI: Because an unpublished opinion cited for its persuasive value is not precedent, it is not binding on any court of this state.

So it's my understanding, I don't have the **Berger** case in front of me, but a per curiam opinion, and this statute, (3)(b), says you can't use it for any purpose.

3

> THE COURT: So it was before Chief Judge Neubauer, Presiding Judge Reilly, and Judge Stark, although it wasn't[3] a per curiam decision. So we'll take it for what it's worth for sure. Regardless, I do believe that your reading of **Trade Well**,[4] Mr. Coletti, is too narrow. And I believe that defendant's reading of **Trade Well** is accurate. So I will allow for attorney's fees.

¶92 Although the WIS. STAT. RULE 809.23(3) violation occurred in the circuit court and stemmed from the Trust's trial lawyer having cited and referenced **Berger** in the course of argument, I write this concurrence to make it abundantly clear to both the circuit court and counsel as to what this RULE prohibits in regard to recitation to, and reliance upon, an unpublished per curiam opinion of this court regardless of when it was issued. As reflected in the RULE's clear and unambiguous language, aside from a reason explicitly provided for therein, a per curiam opinion—even one decided on or after July 1, 2009—cannot be cited even "as precedent or authority" because it does not qualify as an *authored* unpublished opinion. *See* RULE 809.23(3)(a) and (b). The language that online databases such as Westlaw and LexisNexis add to the beginning of unpublished opinions, which the Trust's trial lawyer referenced at the hearing

---

[3] Although the transcript reflects that the circuit court stated that **Berger** "*wasn't* a per curiam," the word "wasn't" is presumably a transcription error as **Berger** clearly states that it *is* a per curiam opinion. *See* **Berger v. Herb G. Schroeder & Sons, Inc.**, No. 2015AP212, unpublished slip op., ¶1 (WI App Mar. 16, 2016) (emphasis added).

[4] **Trade Well International v. United Central Bank**, No. 12-cv-701-wmc, 2014 WL 5307933 (W.D. Wis. Oct. 16,2014), is a non-binding, unpublished federal district court case. *See, e.g.*, **Lomax v. Fiedler**, 204 Wis. 2d 196, 217, 554 N.W.2d 841 (Ct. App. 1996) (explaining that federal district and appellate court decisions are not binding on state courts).

cited above,[5] appears as a warning for lawyers and judges to read RULE 809.23(3) for confirmation as to whether an unpublished opinion may be cited. That warning language is not the law; the RULE is. Attorney Coletti was therefore correct in advising the circuit court that our Rules of Appellate Procedure prohibit citation of or reliance on unpublished per curiam opinions for any reason except for the limited exceptions explicitly set forth in RULE 809.23(3)(a).

¶93    The Trust's appellate counsel also referred to **Berger** in its appellate brief. While appellate counsel did not do so for the purpose of asking us to follow **Berger** as trial counsel did, appellate counsel nevertheless referred to it in an attempt to persuade us that the circuit court did not *actually* rely on **Berger** when it decided the attorney's fee issue. In doing so, the Trust's appellate attorney dismisses the circuit court's reliance on **Berger**, telling us only that the court said **Berger** was "dicta" and that Attorney Coletti told the circuit court it could not rely on **Berger**. The problem with the Trust's position in regard to **Berger** before this court is that it ignores the full context in which that "somewhat dicta" statement arose.

¶94    As seen from the transcript recited above, the circuit court rejected Attorney Coletti's warning that it could not rely on **Berger**. First, the court took a recess specifically to review **Berger**, and after that recess, the Record demonstrates that it *did* rely on **Berger** in making its decision. It discussed the

---

[5] During the discussion regarding **Berger**'s precedential value, and after opposing counsel indicated that a per curiam cannot be cited pursuant to WIS. STAT. RULE 809.23(3), the Trust's trial lawyer stated, "*the version that we have, it -- it talks about the distinction of is it before or after July 1 of 2009. And this decision came in 2016. So our understanding is if it's a per curiam after July 1 of 2009, it can be used for persuasive authority.*" (Emphasis added.) This was clearly in reference to the warning language that appears on an online database such as Westlaw or LexisNexis.

facts of the *Berger* case, and it insisted Attorney Coletti was wrong about not being able to rely on *Berger*. And, although the Trust's appellate brief is correct insofar as what the circuit court said during its discussion was that *Berger* was "somewhat dicta," it is clear from reading the transcript in its entirety that what the court meant was that *Berger* did not explicitly hold that the slander statute allows for attorney's fees. In other words, in referring to "dicta," the court did not do so in the sense of indicating it would not rely on *Berger*. Rather, in referring to "dicta," the court was indicating that even though *Berger* only implicitly held that attorney's fees could be awarded for slander, it found *Berger* persuasive and was relying on it in making its decision. That the court concluded it could rely on *Berger* is clear both from its exchange with Attorney Coletti as to whether or not it could do so and from its final comment that *Berger* was decided by the chief judge, a presiding judge, and an experienced appellate court judge. Although the court also relied on *Trade Well* in reaching its conclusion, that does not change the fact that it still relied on *Berger*.

¶95 It is unclear whether the Trust's trial lawyer simply did not understand WIS. STAT. RULE 809.23(3), which is troubling, or rather, despite knowing *Berger* was uncitable, intentionally misled the circuit court into considering and relying on it anyway. Either way, the Trust's trial counsel put its appellate counsel in a difficult position, and to an extent, appellate counsel compounded trial counsel's error by attempting to convince us that the circuit court had not relied on *Berger* at all rather than simply, as a best practice, acknowledging trial counsel's error, which would not have conceded the attorney's fee issue.

¶96 WISCONSIN STAT. RULE 809.23(3) is not new, and we expect that all lawyers and judges should by now understand the rules regarding citation of, and

reliance on, unpublished opinions. The fact that the circuit court in this case and the Trust's trial lawyer did not know the law is troubling. I join the Majority but also respectfully concur.